FILED

November 1, 2018
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ
By: /s/ Juan Filgueiras, Courtroom Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>CHRISTINE R. COPPOLA,<br><br>                                      Debtor. | Case No.:      17-14944 VFP<br><br>Chapter    13 |
| CHRISTINE R. COPPOLA,<br><br>                                  Plaintiff,<br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>                                  Defendant. | Adv. Pro. No.: 17-1621 VFP |

## OPINION

**APPEARANCES**

LAW OFFICES OF ANDY WINCHELL, PC
100 Connell Drive, Ste. 2300
Berkeley Heights, NJ  07922
Andy Winchell, Esq.
Attorney for Debtor/Plaintiff, Christine R. Coppola

REED SMITH LLP
Henry F. Reichner, Esq.
Three Logan Square, Ste. 3100
1717 Arch Street
Philadelphia, PA  19103-7301
Attorneys for Defendant, Wells Fargo Bank, N.A.

**VINCENT F. PAPALIA, Bankruptcy Judge**

### I.        INTRODUCTION

This matter is before the Court on the Motion (the "Motion") filed by the Debtor, Christine R. Coppola (the "Debtor"), to file a First Amended Complaint.  Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Bank") has filed an Objection on the grounds that amendment would be futile,[1] and the Debtor, a Reply.[2]  The Complaint arises from Debtor's contention that the Bank did not properly process or respond to Debtor's application for a post-petition mortgage loan modification, resulting in alleged violations of federal and state statutes and federal regulations.

### II.        JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012.[3]  The Debtor alleges in the Complaint that this is "primarily a non-core proceeding" outside 28 U.S.C. § 157(b)(2), but consents to entry of final judgment by this Court.[4] Venue is proper in this Court under 28 U.S.C. § 1408.  The Court issues the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent that Wells Fargo does not consent to entry of final judgment by this Court, these are the Court's proposed findings of fact and conclusions of law.  To the extent that any of the findings of fact (final or proposed) might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

---

[1] Dkt. No. 11.
[2] Dkt. No. 12.
[3] In its prior Motion to Dismiss the original Complaint, the Bank argued that this Court lacked subject matter jurisdiction over Count I of the Complaint.  The Court dismissed Count I of the original Complaint by Order Granting in Part and Denying in Part, Defendant's Motion to Dismiss, entered on April 4, 2018 (Dkt. No. 7).
[4] Dkt. No. 1, Compl., ¶¶ 4-5.  The Debtor also alleged that the Bank consented to jurisdiction by filing Claim No. 2-1 (Dkt. No. 1, Compl., ¶ 6).

2

## III.        **STATEMENT OF RELEVANT FACTS**

### A. **Immediate Procedural Background**

This is the second round of motion practice between Debtor and the Bank in this adversary proceeding that Debtor initiated by filing a two-count Complaint on September 19, 2017.  In the first round, the Debtor sought to:

(1)    disallow the proof of claim filed by Wells Fargo, as servicer for present trustee/mortgagee, U.S. Bank, N.A., on the grounds that it does not have standing to file the claim; and

(2)    charge Wells Fargo with violations of 12 U.S.C. § 2601 *et seq.*, the Real Estate Settlement Procedures Acts ("RESPA"), and 12 C.F.R. § 1024 *et seq.* ("Regulation X"), for Wells Fargo's management of the loss mitigation/loan modification process post-petition.[5]

The Debtor made clear at that time and reiterates in her instant Motion that, as a remedy, she seeks RESPA damages only and not a loan modification.[6]

On October 20, 2017, the Bank moved to dismiss the Complaint under FED. R. BANKR. P. 12(b)(1) and (b)(6).  After a hearing and oral argument on March 27, 2018, the Court issued an oral decision on that date.  The Court's ruling was memorialized in an April 4, 2018 Order that dismissed the First Claim for Relief ("Count I") with prejudice and granted Debtor leave to move to amend her Second Claim for Relief ("Count II") by May 22, 2018 with related instructions, including requiring the submission of the May 22, 2017 letter from the Bank that denied Debtor's loan modification and on which Debtor's Notice of Error and appeal were based.[7]

The Debtor filed the instant Motion in compliance with the April 4, 2018 Order, including

---

[5] Dkt. No. 1, Compl., ¶¶ 48-52, 67-72, 74.   The Bank appears to use "loss mitigation" synonymously with "loan modification."

[6] For example, Debtor's counsel argued in her objection to the Bank's prior motion:  "Here, although the [Debtor] believes that she would have been offered a loan modification if the Defendant had implemented the required procedures correctly, the Plaintiff is not challenging the ultimate decision at this juncture.  She brings this action because the Defendant did not follow the procedures mandated by Regulation X.  *She is challenging the process, not the result.*"  Dkt. No. 4, Debtor's Br., at 5 (emphasis supplied).

[7] Dkt. No. 7, Order Granting in Part and Denying in Part, Defendant's Motion to Dismiss.

with it the proposed First Amended Complaint, the May 22, 2017 letter and certain other letters

generated after the initial motion practice.[8]  Specifically, the Proposed First Amended Complaint

(the "Amended Complaint") does the following:

> (i)      modifies Count II (as discussed below) and renumbers it as Count I;
>
> (ii)     adds Count II, alleging violation of New Jersey Law Against Discrimination
>          ("NJLAD"), N.J.S.A. § 10:5-12, on the grounds that the Bank failed or
>          refused to consider the income of Debtor's spouse in determining her
>          creditworthiness; and
>
> (iii)    adds Count III, alleging violation of New Jersey Consumer Fraud Act
>          ("NJCFA"), N.J.S.A. § 56:8-2, unconscionable commercial practice, as a
>          function of the NJLAD violation.[9]

## B.  <u>The Loan and State Court Proceedings</u>

The Debtor signed a Note for $371,500 to NJ Lenders Corp. on April 5, 2006 and the

Debtor and her nondebtor spouse, Robert John Coppola, signed a Mortgage securing the Note with

the borrowers' real property at 46 Hamilton Road, Verona, New Jersey 07044 (the "Property").[10]

The Mortgage was recorded on April 21, 2006.[11]

The Debtor defaulted on the loan, and U.S. Bank, as assignee, filed a foreclosure complaint

on June 17, 2013.[12]  The State Court held a trial on May 20, 2015 and June 4, 2015.[13]  The State

Court rejected the Debtor's challenge of the standing of U.S. Bank to file the foreclosure action

and Debtor's other alleged claims and defenses.[14]  The State Court therefore struck Debtor's

answer and returned the case to the Foreclosure Unit.[15]  Final Judgment of Foreclosure was entered

---

[8] Dkt. No. 9-1, Am. Compl.
[9] Dkt. No. 9-1, Am. Compl., ¶¶ 70-86.
[10] Claim No. 2-1.
[11] Claim No. 2-1.
[12] Dkt. No. 3-3, Reichner Certif., Ex. 1, Hr'g Tr. 22:10-11, June 4, 2015.  U.S. Bank was represented by Phelan
Hallinan Diamond & Jones, PC at the foreclosure proceeding in State Court; on its Proof of Claim No. 2-1 in
Bankruptcy Court; and on its objection to confirmation in Bankruptcy Court.
[13] Dkt. No. 5-2, Reichner Reply Certif., Ex 1, Hr'g Tr. 21:6-11, May 20, 2015.
[14] Dkt. No. 3-3, Reichner Certif., Ex. 1, Hr'g Tr. 27:6-13, June 4, 2015.
[15] Dkt. No. 3-3, Reichner Certif., Ex. 1, Hr'g Tr. 28:3-7, June 4, 2015.

on July 19, 2016 for $452,684.38.[16]   The Debtor appealed the Judgment, and the Appellate Division upheld the Judgment in a decision entered post-petition on November 8, 2017.[17]

### C.  **The Bankruptcy Proceeding**

The Debtor filed the instant Chapter 13 petition (her first case) on March 13, 2017 and scheduled the Property with a value of $480,000 and a debt of $470,461.80 due to the Bank.[18]  The Plan proposed a loan modification by August 2017.[19]  U.S. Bank filed an objection to confirmation on March 23, 2017 on the grounds that Debtor provided no treatment for its claim in the Plan other than through loan modification.[20]  There appears to be no dispute that the Debtor's Plan cannot be confirmed absent a loan modification.

The Debtor applied for loss mitigation under the Court's program on March 23, 2017.[21] The Court entered an Order for loss mitigation on April 12, 2017 with an end date of July 10, 2017.[22]  Debtor did not seek an extension of that date, and the deadline expired.

### D.  **The U.S. Bank Proof of Claim and Motion to Expunge**

U.S. Bank filed Claim No. 2-1 on April 11, 2017 for $486,254 (secured).  The Debtor filed a motion objecting to the Claim on May 17, 2017, and U.S. Bank filed a response on August 10, 2017.[23]  That motion was marked "moot" on September 21, 2017 after the Debtor filed the instant adversary proceeding on September 19, 2017.  As noted above, by Order entered on April 4, 2018, the Court dismissed with prejudice Count I of the original Complaint, which sought to disallow

---

[16] Dkt. No. 3-3, Reichner Certif., Ex. 3, July 19, 2016 Final Judgment of Foreclosure.
[17] Dkt. No. 11, Bank Br., at 3, citing to *U.S. Bank, N.A. as Trustee v. Coppola*, 2017 WL 5171864, at *1 (N.J. Super. Ct. App. Div. Nov. 8, 2017).
[18] Main Dkt. No. 1, Pet., Sch. D.
[19] Main Dkt. No. 2, Plan, at 2
[20] Main Dkt. No. 11.  The Trustee also filed an objection on grounds unrelated to the treatment of the mortgage debt (Main Dkt. No. 15).
[21] Main Dkt. No. 10.
[22] Main Dkt. No. 13, Loss Mitigation Order.
[23] Main Dkt. Nos. 17 and 20.

Claim No. 2-1 and to declare that the Bank, which serviced the loan for U.S. Bank, lacked standing

to file a proof of claim.[24]  Thus, Claim No. 2-1 is an allowed claim, and the Debtor's objection to

that Claim was overruled.[25]

### E.  The Loss Mitigation/Loan Modification Application

The course of the Debtor's loss mitigation/loan modification application is described in

letters attached to the Proposed Amended Complaint at Exhibits A-H (only Exhibits B through E

were attached to the original Complaint):[26]

Ex. A:    May 22, 2017 letter from Bank (signed by Amanda Solsma, Home
Preservation Specialist) to Debtor denying loan modification on the
grounds that her gross monthly income, at $5,836, was too low.

Ex. B:    May 29, 2017 letter from Debtor's counsel, Andy Winchell, Esq.
("Winchell") to Bank couched as a "Notice of Error under 12 C.F.R.
§ 1024.35 of Regulation X of the Mortgage Servicing Act under
[RESPA]" indicating that the Debtor submitted a complete loan
modification package on May 16, 2017 and was denied a loan
modification in a "May 20, 2017" letter.[27]  Winchell states in his May
29, 2017 letter that the lender miscalculated Debtor's income as $5,860,
rather than as $8,968.

Ex. C:    June 7, 2017 letter from Bank (again signed by Amanda Solsma, Home
Preservation Specialist) denying appeal of May 29, 2017 without further
explanation; stating that Debtor still does not qualify for a loan
modification; but suggesting short sale or deed in lieu of foreclosure if
Debtor qualifies for those options.[28]

Ex. D:    June 12, 2017 letter from Winchell to Bank, also couched as "Notice of
Error," reiterating much of the language of Debtor's May 29, 2017 letter
and claiming that the lender's "Appeal Denial" of June 7, 2017 was
inadequate and did not conform to 12 C.F.R. § 1024.41(d).

---

[24] Dkt. No. 7, April 4, 2018 Order.
[25] As is acknowledged by the Debtor, she is no longer challenging the Bank's foreclosure.  All the claims in the
Amended Complaint relate to the Bank's post-petition conduct in processing her loss mitigation/loan modification
applications.  Thus, there is no remaining challenge or objection to the Bank's prepetition Proof of Claim.
[26] Dkt. No. 9-1, Am. Compl., Exs. A-H.
[27] It appears that "May 20, 2017" is a misnomer, and that the Debtor means the Bank's May 22, 2017 letter, attached
to the Amended Complaint as Exhibit A.
[28] Dkt. No. 11, Bank. Br., at 3-4 (Bank acknowledges that the May 29, 2017 letter was an appeal of the loan
modification denial); see also Dkt. No. 9-1, Am. Compl., Ex. C.

Ex. E:   June 28, 2017 letter from Henry F. Reichner, Esq., of ReedSmith LLP, on behalf of the Bank ("Reichner") to Winchell responding to the Debtor's letters and advising the Debtor that a "Notice of Error" was not the proper mechanism for appealing the denial of loan modification, citing *Wiggins v. Hudson City Savings Bank*, 2015 WL 4638452, at *8 (Bankr. D.N.J. Aug. 4, 2015).

The remaining three exhibits are new and arise from the Debtor's having submitted a second "loss mitigation" application on March 6, 2018:[29]

Ex. F:   March 19, 2018 letter from Bank (signed by Hiliary Phillips, Home Preservation Specialist) to Debtor:
   (i)    advising her that she is eligible for a short sale; and
   (ii)   denying her loan modification based on a gross monthly income of $5,503.

Ex. G:   April 5, 2018 letter from Winchell to Reichner couched as:
   (i)    a Request for Information under 12 C.F.R. §§ 1024.36(c) and (d) of Regulation X; and
   (ii)   a Notice of Error under 12 C.F.R. § 1024.35 of Regulation X, specifically for denying loan modification on a finding of $5,503 in gross monthly income, where Debtor claims that her gross, bi-monthly [sic, bi-weekly] paystubs are $2,993.05 (for a monthly total of $6,484.94) and that her nondebtor spouse's monthly income is $5,373.33 for a grand total of $11,858.27, as calculated by Winchell.[30]  Winchell demanded an explanation "for discounting our Client's income."[31]

Ex. H:   May 3, 2018 letter from Reichner to Winchell reiterating the statements in Reichner's June 28, 2017 letter that a Qualified Written Request ("QWR") is not the proper mechanism for challenging "the accuracy of a loss mitigation denial decision," again citing *Wiggins v. Hudson City Savs. Bank*, 2015 WL 4638452, at *8 (Bankr. D.N.J. Aug. 4, 2015).[32]

The Bank denied this appeal on May 1, 2018:

---

[29] The Debtor and Bank indicate that Debtor made this submission at the Court's suggestion.  Dkt. No. 9-1, Am. Compl., ¶¶ 28-30; Dkt. No. 11, Bank Br., at 5.  However, the Court does not recall making any such suggestion. Instead, the Court's recollection is that the Debtor advised at the March 27, 2018 hearing that she intended to submit another loan modification application that would likely form the basis of an Amended Complaint, which is how the Debtor proceeded.
[30] Dkt. No. 9-1, Am. Compl., Ex. G, at 2-3.  The Court notes that a *bi-weekly* income of $2,993.05 would result in a monthly gross income of $6,484.94 to the Debtor ($2,993.05 *x* 26 ÷ 12 = $6,484.94).
[31] Dkt. No. 9-1, Am. Compl., Ex. G, at 3.
[32] Dkt. No. 9-1, Am. Compl., Exs. A-H.

7

Ex. I:      May 1, 2018 letter from Bank (again signed by Hiliary Phillips,
            Home Preservation Specialist) denying Debtor's appeal without
            further explanation.[33]

Based on the record to date, neither the Debtor nor the Court knows if the Bank disregarded or discounted the income of Debtor's spouse, why it may have done so, or how the Bank came to its conclusion as to the income of the Debtor and her nondebtor spouse as set forth in the denial letters of May 22, 2017 and March 19, 2018.[34]

## F.   **The Instant Motion to Amend**

The Debtor timely filed her Motion to Amend on May 22, 2018.  Debtor seeks to file a three-count Amended Complaint as follows:

Count I alleges that the Bank violated 12 U.S.C. § 2601 *et seq.*, the Real Estate Settlement Procedures Acts ("RESPA"), and 12 C.F.R. § 1024.36, Regulation X, by the Bank's actions in connection with the post-petition loss mitigation/loan modification process.  This Count, formerly Count II, has undergone certain limited changes (described below) from the original Complaint.

Count II is new and alleges that the Bank violated the New Jersey Law Against Discrimination ("NJLAD," or "LAD"), N.J.S.A. § 10:5-1 *et seq.*, particularly N.J.S.A. §§ 10:5-12 and 10:5-13, by disregarding the Debtor's spouse's income in analyzing the Debtor's creditworthiness for a loan modification.

Count III is also new and alleges that the Bank violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2, by disregarding certain components of Debtor's income in violation of NJLAD.[35]  Count III is dependent upon Count II, as was acknowledged by Debtor's counsel at oral argument on July 31, 2018 and in Debtor's prior filings.

---

[33] Dkt. No. 11, Bank Br., Ex. 1, May 1, 2018 letter from Bank to Debtor.
[34] Dkt. No. 9-1, Am. Compl., Exs. A and F.
[35] Dkt. No. 9-1, Am. Compl., ¶¶ 70-86.

In Amended Count I, the Debtor proposes the following changes to the following three

paragraphs (quoting):[36]

> **Old ¶ 69**.      The Defendant failed to respond appropriately to the Plaintiff's May 29 Notice of Error and June 12 Notice of Error.
>
> **New ¶ 61.**  The Defendant failed to respond appropriately to the Plaintiff's May 29, 2017 Request for Information/Notice of Error, June 12, 2017 Request for Information/Notice of Error, and April 5, 2018 Request for Information/Notice of Error.
>
> **Old ¶ 73.**      Upon information and belief, the most plausible explanation for the Defendant's failure to correct obvious miscalculation on appeal is that the Defendant staffed the appeal with the same personnel that evaluated the Plaintiff's original application.
>
> **New ¶ 65.**      The Defendant staffed one or more of the [Plaintiff's] appeals with some of the same personnel that evaluated the Plaintiff's original application.
>
> **Old ¶ 74.**      The Defendant ignored its obligations under 12 C.F.R. 1024.36 and failed to respond as required to the Plaintiff's Application, Notice of Error and Request for Information.
>
> **New ¶ 66.**      The Defendant ignored its obligations under 12 C.F.R. 1024.36 and failed to respond as required to the Plaintiff's May 29, 2017 Request for Information/Notice of Error, June 12, 2017 Request for Information/Notice of Error, and April 5, 2018 Request for Information/Notice of Error.

## IV.    <u>ARGUMENTS OF PARTIES</u>

In support of her Motion to amend, the Debtor submitted a five-page brief (of which only

two pages contain substantive argument) and argued generally that:

(i)     As to Count I, that the Bank never provided an adequate or specific explanation in its denial letters for failing to consider or discounting Debtor's spouse's income in its loan modification analysis, or how it arrived at its income number generally, and therefore violated RESPA;

(ii)    As to Count II, that the Bank discriminated against the Debtor under N.J.S.A. § 10:5-12(i)(4) which prohibits a lender which is extending credit from "discriminat[ing] against any person or group of persons because of the source

---

[36] D.N.J. LBR 7015-1(a)(ii) requires the Plaintiff to submit a redlined (or similar) copy of the original Complaint along with any amended Complaint.  Debtor failed to provide this redlined copy.

of any lawful income received by that person. . . ."[37]  Here, the Debtor adds the general allegation that "The [Bank] routinely and systematically discriminates against borrowers whose income comes from self-employment or sales commissions rather than salary or wages";[38] and

(iii)     As to Count III, Debtor essentially alleges that the Bank's actions above constitute "unconscionable" commercial practice within the meaning of the New Jersey Consumer Fraud Act.[39]  As was noted above, the Amended Complaint makes clear, and the Bank interprets Debtor to mean, that the NJLAD violation is also an NJCFA violation so that if the former fails, so does the latter.[40]

The Bank argues in its Objection that:

(i)      Although 12 C.F.R. § 1024.41(h)(3) requires that the person who handles the loss mitigation appeal be different from the person who made the initial review (even if only the supervisor of the initial reviewer), Debtor's presumption that the same person "must have" reviewed the initial application and the appeal is speculative and unsubstantiated.[41]

(ii)     The denial of a RESPA appeal is unappealable.  12 C.F.R. § 1024.41(h)(4) ("A servicer's determination under [Section 1024.41(h)] is not subject to any further appeal").[42]  The Bank declares, "That should have been the end of it," but offers no further information about its analysis of Debtor's income or the Debtor's requests for information, either in its responses to the Debtor's Notice of Error/Request for Information/Appeal correspondence or in the Bank's otherwise extensive submissions to this Court;[43]

(iii)    A Notice of Error ("NOE") is not a valid mechanism for contesting a loss mitigation evaluation under 12 C.F.R. § 1024.35(b);[44]and

(iv)     A loan modification does not warrant a Qualified Written Response ("QWR") because it does not involve "loan servicing."[45]

---

[37] Dkt. No. 9, Debtor's Br., at 4.

[38] Dkt. No. 9, Debtor's Br., at 4.  The Amended Complaint alleges at ¶ 41 that Debtor found "over 17,000 consumer complaints against the [Bank] with the tag of 'loan modification, collection, foreclosure' within the CFPB [Consumer Financial Protection Bureau] database," but does not develop this allegation with exhibits or with any argument in the Motion (Dkt. No. 9-1, Am. Compl., ¶ 41).

[39] Dkt. No. 9, Debtor's Br., at 4.

[40] Dkt. No.  9-1, Am. Compl., Count III, ¶¶ 76-86; Dkt. No. 11, Bank Br., at 2.

[41] Dkt. No. 11, Bank Br., at 15-16; 12 C.F.R. § 1024, Supp. I, ¶ 41(h)(3)-1.

[42] Dkt. No. 11, Bank Br., at 17.

[43] Dkt. No. 11, Bank Br., at 17.

[44] Dkt. No. 11, Bank. Br. at 18.

[45] Dkt.  No. 11, Bank Br. at 19-21.

The Debtor filed a Reply that more substantively addressed the Bank's objection and the Debtor's affirmative claims.[46]

## V.   STATEMENT OF LAW

### A.   12 U.S.C. § 2601 *et seq.* ("RESPA") and 12 C.F.R. § 1024 *et seq.* ("Regulation X")

The arguments of the parties turn on conflicting interpretations and application of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 through § 2617, and its implementing regulations at 12 C.F.R. § 1024.1 through § 1024.41 (and Appendices) ("Regulation X") (effective on January 10, 2014).   In particular, the parties' dispute centers on 12 C.F.R. §§ 1024.35, 1024.36 and 1024.41, which describe the error resolution and "loss mitigation" procedures and address requests for information by borrowers.

The Court in *Smallwood v. Bank of Am., N.A.,* 2015 WL 7736876, at *5, n.10 (S.D. Ohio Dec. 1, 2015) described the purpose of the RESPA statute and regulations as follows:

> RESPA is a consumer protection statute that requires loan servicers to provide timely written responses to borrowers under certain circumstances. 12 U.S.C. § 2605. The Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X) is a Consumer Financial Protection Bureau regulation promulgated pursuant to section 1022(b) of the Dodd–Frank Act, 12 U.S.C. § 5512(b), and RESPA, 12 U.S.C. § 2601, *et seq.* Regulation X became effective on January 10, 2014. 78 FR 10696–01 (February 14, 2013) (codified at 12 C.F.R. pt. 1024). 12 C.F.R. § 1024.35 outlines error resolution procedures by which a borrower may notify a servicer of errors on its account, triggering a response by the servicer. 12 C.F.R. § 1024.36 outlines requests for information, under which a servicer must provide certain requested information pursuant to a QWR.

Within RESPA, 12 U.S.C. § 2605 ("Servicing of mortgage loans and administration of escrow accounts") sets forth certain general parameters for servicing and disclosure:

> (a) Disclosure to applicant relating to assignment, sale, or transfer of loan servicing.  Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.

---

[46] Dkt. No. 12**.**

12 U.S.C. § 2605(a).

Although the Bank's counsel appeared to assert during oral argument that there is no private right of action for violation of RESPA procedures under 12 C.F.R. § 1024.35 or § 1025.36, no case law or other authority was cited for that proposition. Thus, the Court is not required to address this argument.[47] Nonetheless, 11 U.S.C. § 2605(f) does authorize individual rights of action for damages for RESPA violations:

> (f)    Damages and costs
> Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:
>
> (1) Individuals
> In the case of any action by an individual, an amount equal to the sum of--
>
> > (A) any actual damages to the borrower as a result of the failure; and
> >
> > (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

12 U.S.C. § 2605(f).[48] Under the majority view, this private right of action includes violations of the regulations under RESPA including 12 C.F.R. §§ 1024.35, 1024.36 and 1024.41, even if the underlying regulation does not specifically reference 12 U.S.C. § 2605(f).[49] The cases that allow

---

[47] The Court notes that Wells Fargo did argue that there is no private right of action under § 1024.41 based on a servicer's substantive evaluation of a loss mitigation application. See Dkt. No. 11, Bank Br., at 12-13. However, as noted previously, Debtor's claim is not based on Wells Fargo's substantive evaluation of her application for loss mitigation. Instead, Debtor's claim is that Wells Fargo made a factual error as to her and her spouse's income and failed to respond to her Notices of Error and Requests for Information relating to that asserted error.

[48] *Lage v. Ocwen Loan Servicing, LLC*, 839 F.3d 1003, 1007 (11th Cir. 2016) (12 U.S.C. § 2605(f) "create[es] a private right of action for a borrower to sue '[w]hoever fails to comply with any provision of this section'").

[49] For the majority view, *see, e.g., Lage v. Ocwen Loan Servicing, LLC*, 839 F.3d at 1007 (as to 12 C.F.R. §§ 1024.35 and 1024.41; *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 270-71 (S.D.N.Y. 2017); *Ford v. Nationstar Mortgage, LLC*, 2018 WL 2418541, at *3 (D. Nev. May 28, 2018); *Weber v. Seterus, Inc.*, 2018 WL 1519163, at *7 (N.D. Ill. Mar. 28, 2018); *Starke v. Select Portfolio Servicing, Inc.*, 2017 WL 6988657, at *5 (N.D. Ill. Dec. 18, 2017) (all as to 12 C.F.R. § 1024.35); *Anderson v. Wells Fargo Home Mortgage*, 2017 WL 4181114, *5 (E.D. Calif. Sept. 21, 2017); and *Brewer v. Wells Fargo Bank, N.A.*, 2017 WL 1315579, at *5 (N.D. Calif. Apr. 6, 2017) (both as to 12 C.F.R. § 1024.36). For the minority view, *see e.g., Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1378-79 (S.D. Fla. 2015) (deeming that RESPA creates a private right of action for only three types of conduct listed in 12 U.S.C. §§ 2605(f); 2607(a); 2608(b)); *Miller v. HSBC Bank, U.S.A., N.A.*, 2015 WL 585589, at *11 (S.D.N.Y.

a private right of action for Regulation X violations, even where the regulation does not reference the 12 U.S.C. § 2605(f) remedies, often cite the remedial nature of RESPA and of Regulation X and the broad mandate of the Consumer Financial Protection Bureau, which declared in its Mortgage Servicing Rules, 78 Fed. Reg. at 10714 n.64 that "'*regulations* established pursuant to section 6 of RESPA [12 U.S.C. § 2605] are subject to section 6(f) of RESPA [12 U.S.C. § 2605(f)], which provides borrowers a private right of action to enforce such regulations.'" *Sutton*, 228 F. Supp. 3d at 271 (emphasis supplied). This Court agrees with the majority view and the Bureau, including the reasoning on which those determinations are based.

### B.   The Meaning of "Servicer" and "Servicing" Under Regulation X

Wells Fargo argues that its involvement in the loss mitigation process does not fall within the meaning of "servicing," as defined in Regulation X and RESPA, and that therefore the Notice of Error procedure does not apply to loss mitigation. For the following reasons, this Court finds that this interpretation is too narrow, and that it is inconsistent with the terms of Regulation X generally and the notice of error, loss mitigation and request for information regulations specifically.

Wells Fargo's argument is based on the definition of servicing in RESPA in 12 U.S.C. § 2605(i)(3) and Regulation X in 12 C.F.R. § 1024.2(b). Specifically, 12 U.S.C. § 2605(i)(3) defines servicing as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payment of principal and interest and such other amounts received from the borrower as may be required pursuant to the terms of the loan."

Additionally, Regulation X has general definitions at 12 C.F.R. § 1024.2 ("Definitions")

---

Feb. 11, 2015); and *Wilson v. Bank of Am., N.A.*, 2016 WL 8793204, at *8 (S.D. Fla. May 2, 2016) (both of which deem that the borrower has no private right of action for a 12 C.F.R. § 1024.35 violation because that regulation does not specifically reference 12 U.S.C. § 2605(f) remedies, as 12 C.F.R. § 1024.41 does).

that include the following definitions of "servicer" and "servicing" at § 1024.2(b):

> Servicer means a person responsible for the servicing of a federally related mortgage loan (including the person who makes or holds such loan if such person also services the loan) [with exceptions not relevant here for FDIC, NCUA, FNMA].
> . . . .
>
> Servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including amounts for escrow accounts under section 10 of RESPA (12 U.S.C. 2609), and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract. In the case of a home equity conversion mortgage or reverse mortgage as referenced in this section, servicing includes making payments to the borrower.

12 C.F.R. § 1024.2(b).

Subpart C of Regulation X ("Mortgage Servicing") has its own "scope" and definitions. 12 C.F.R. § 1024.30(a) ("Scope") provides that "this subpart applies to any mortgage loan, as that term is defined in § 1024.31" [with exceptions for "small servicer" and reverse mortgages not relevant here]. 12 C.F.R. § 1024.30(a). 12 C.F.R. § 1024.31 ("Definitions") does *not* have a new definition for "servicer" or "servicing" (amplifying or supplanting 12 C.F.R. § 1024.2, *supra*). The nearest addition is "service provider" ("Service provider means any party retained by a servicer that interacts with a borrower or provides a service to the servicer for which a borrower may incur a fee"). 11 C.F.R. § 1024.31.

Though helpful, the Court finds that these definitions are not exhaustive or exclusive descriptions of duties or rights of a servicer under Regulation X. Instead, the duties and rights of a servicer (and a borrower) are further described at length and in detail in other provisions of Regulation X, including (as is particularly relevant here): 12 C.F.R. § 1024.35 ("Error Resolution Procedures"); § 1024.36 ("Requests for Information") and § 1024.41 ("Loss Mitigation

14

Procedures"). For example, 12 C.F.R. § 1024.35 provides in pertinent part as follows:

> (a) Notice of error. A *servicer* shall comply with the requirements of this section
> for any written notice from the borrower that asserts an error and that . . . enables
> the *servicer* to identify the borrower's mortgage loan account . . . . A notice on
> a payment coupon or other payment form supplied by the *servicer* need not be
> treated by the *servicer* as a notice of error. A qualified written request that
> asserts an error relating to the *servicing* of a mortgage loan is a notice of error
> for purposes of this section, and a *servicer* must comply with all requirements
> applicable to a notice of error with respect to such qualified written request.

12 C.F.R. § 1024.35(a) (emphases supplied). Each of the other subsections of § 1024.35 includes

references to a servicer and/or servicing and what a "servicer" must do in "servicing" a loan, much

of which goes well beyond accepting and making payments. See subsections (b), (c), (d), (e), (f),

(g), (h) and (i).

Similarly, § 1024.36, which does not include an apparently limiting "scope of error

regulation" section that is part of § 1024.35, sets forth the duties of a servicer and obligations of a

borrower in connection with a Request for Information.   In language virtually identical to

§ 1024.35(a), section 1024.36(a) provides initially and in pertinent part as follows:

> (a) Information request. A *servicer* shall comply with the requirements of
> this section for any written request for information from a borrower
> that . . . enables the *servicer* to identify the borrower's mortgage loan
> account. . . . A qualified written request that requests information
> relating to the *servicing* of the mortgage loan is a request for
> information for purposes of this section, and a *servicer* must comply
> with all requirements applicable to a request for information with
> respect to such qualified written request.

12 C.F.R. § 1024.36(a) (emphases supplied). Each of the other subsections of § 1024.36(b)

through (i) refers to the servicer and servicing of a mortgage loan and similarly describes servicer

duties that go significantly beyond accepting and making payments.

Section 1024.41, which sets forth "Loss Mitigation Procedures," also refers repeatedly to

the servicer and its duties and obligations in each of its subsections. Thus, in this Court's view,

the duties, obligations and rights of a servicer (and borrower) are not expressly limited by the "servicer" or "servicing" definitions in RESPA or Regulation X. Instead, the Court will read RESPA and particularly Regulation X as an integrated set of laws and regulations and determines that the duties and obligations of a servicer and the definition of servicing must be read to include the duties and obligations specifically described in the various sections of Regulation X, including (without limitation) §§ 1024.35, 1024.36, and 1024.41.[50]

For these reasons and as a matter of common sense, the Court rejects Wells Fargo's argument that the definition and scope of servicer and servicing should be limited to what essentially amounts to accepting and remitting payments. As is made plain by these (and other) sections, the duties of a "servicer" in "servicing" a mortgage loan go substantially beyond the limited definitions argued by Wells Fargo. The Court rejects those unnecessarily and improperly limiting interpretations of servicer and servicing in favor of an interpretation that includes what a servicer is required to do under the specific provisions of Regulation X, as described in this Opinion and those regulations. The Court will now proceed to analyze the Debtor's claims under these sections of Regulation X as set forth in Count I of the Amended Complaint.

### C. Error Resolution Procedures and Related Requests for Information

As was noted above, C.F.R. § 1024.35(a) ("Error resolution procedures") states as a general premise that:

> A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. . . .

---

[50] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (internal citations omitted) (interpreting the Fair Credit Reporting Act under 15 U.S.C. § 1681e(a).

12 C.F.R. § 1024.35(b) sets forth eleven events which fall under the scope of "error resolution":

> (b) Scope of error resolution. For purposes of this section, the term "error" refers to the following categories of covered errors:
>
> (1) Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments.
>
> (2) Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law.
>
> (3) Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of 12 C.F.R. § 1026.36(c)(1).
>
> (4) Failure to pay taxes, insurance premiums, or other charges, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay, in a timely manner as required by § 1024.34(a), or to refund an escrow account balance as required by § 1024.34(b).
>
> (5) Imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower.
>
> (6) Failure to provide an accurate payoff balance amount upon a borrower's request in violation of section 12 C.F.R. § 1026.36(c)(3).
>
> (7) Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39.
>
> (8) Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer.
>
> (9) Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(f) or (j).
>
> (10) Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j).
>
> (11) Any other error relating to the servicing of a borrower's mortgage loan.

12 C.F.R. § 1024.35(b).

In this case, the Debtor argues that she falls under subsection (7) and/or (11).  However, in this Court's view, subsection (7) does not apply on its face since the Notices of Error asserted by

the Debtor do not relate to the description of loss mitigation options or foreclosure, and the Debtor

does not assert otherwise in her Amended Complaint. Further, the Bank did provide the Debtor

with its loss mitigation and foreclosure options in its responses.  Whether subsection (11) applies

is less clear and is the subject of conflicting opinions, as is noted by the parties.[51]  In analyzing this

issue and attempting to resolve the conflicting decisions, the Court will look to what the Bank's

servicing obligations include under Regulation X, as noted above.

Those regulations provide that a "servicer" must make an initial response to the Notice of

Error within 7-30 days.  12 C.F.R. § 1024.35(e)(3) ("Time limits") (the actual response time within

these 7-30 days depends upon the nature of the request).  12 C.F.R. § 1024.35(e) ("Response to

notice of error") imposes precise duties of investigation upon the servicer with exceptions not

relevant here[52] and states in most relevant part:

> 12 C.F.R. § 1024.35(e) Response to notice of error.
>
> (1) Investigation and response requirements.
>
>     (i)    In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:
>
>         (A)  Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or
>
>         (B)  *Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination*, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

---

[51] Dkt. No. 11, Bank Br., at 23-25; Dkt. No. 12, Debtor Reply Br., at 14-17.
[52] These exceptions at 12 C.F.R. § 1024.35(f) and (g) include errors self-corrected by the servicer; certain errors noticed too close to a foreclosure sale or otherwise out of time; "duplicative" and "overbroad" notices of error.

      (ii)    Different or additional error. If during a reasonable investigation of a notice of error, *a servicer concludes that errors occurred other than, or in addition to, the error or errors alleged by the borrower, the servicer shall correct all such additional errors and provide the borrower with a written notification that describes the errors the servicer identified, the action taken to correct the errors,* the effective date of the correction, and contact information, including a telephone number, for further assistance.

    (2) Requesting information from borrower. A servicer may request supporting documentation from a borrower in connection with the investigation of an asserted error, but may not:

      (i)    Require a borrower to provide such information as a condition of investigating an asserted error; or

      (ii)    Determine that no error occurred because the borrower failed to provide any requested information without conducting a reasonable investigation pursuant to paragraph (e)(1)(i)(B) of this section.
. . . .

    (4) Copies of documentation. *A servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination* that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents.

12 C.F.R. § 1024.35(e) (emphases supplied).

     The Debtor asserts that the Bank did virtually none of this. The Amended Complaint alleges that the Bank did not substantively respond to Debtor's Notices of Error or Request for Information, nor did it provide any explanation (or documentation) as to how it arrived at the income number that formed the basis of the denial of Debtor's Loss Mitigation Application. The Bank's argument in opposition is that it is not required to respond to the Notice of Error or Request for Information because neither is the proper vehicle to challenge that denial and that the alleged

error does not relate to the "servicing" of the Debtor's loan.  Nonetheless, the Bank's denial letters (Exhibits A and F), specifically identify Wells Fargo as the borrower's servicer and invite the borrower to "notify us of an error" and "request information."  That is precisely what the Debtor did here; however, the Bank did not respond in a substantive manner.

The Bank's position is that it did not have to respond substantively -- other than by identifying the income number it used -- and that the only proper vehicle to review a loss mitigation denial is to take an appeal, which is what Debtor did, twice, and which was twice denied without any explanation.  The Bank argues that is all the Debtor is entitled to under the applicable regulation, 12 C.F.R. § 1024.41(h).[53]

In making these arguments, the Bank relies heavily on the decision of a sister bankruptcy court in this district, *Wiggins v. Hudson City Savings Bank,* 2015 WL 4638452 (Bankr. D.N.J. Aug. 4, 2015) ("*Wiggins I*"), *aff'd in part, rev'd in part and remanded* 2016 WL 5952739 (D.N.J. Oct. 13, 2016) ("*Wiggins II*"), *on remand* 2016 WL 7115864 (Bankr. D.N.J. Dec. 6, 2016) ("*Wiggins III*").  As noted by Wells Fargo, *Wiggins I* held that the plaintiffs were essentially "challeng[ing] the substance of Wells Fargo's determination that they did not qualify for a loss mitigation program" and that the way to challenge such a denial was through "the appeals process of § 1024.41(h) and not the error resolution procedures of § 1024.35(b) . . ."[54]

Insofar as the *Wiggins I* case deals with a challenge to a decision to deny loss mitigation, this Court agrees that the appropriate way to challenge that decision is through the appeal process.

---

[53] The Bank acknowledged Debtor's May 29, 2017 letter (styled "Notice of Error" under 12 C.F.R. § 1024.35) as an *appeal*; denied it without explanation by its June 7, 2017 letter, which also invited the Debtor to "notify us of an error" (Dkt. No. 9-1, Am. Compl., Ex. C, Bank's June 7, 2017 letter).  By letter dated June 12, 2017, again styled "Notice of Error" under 12 C.F.R. § 1024.35, the Debtor repeated her request for an explanation (Dkt. No. 9-1, Am. Compl., Ex. D, June 12, 2017 letter).  The Bank, through counsel, responded in a June 28, 2017 letter that an *appeal*, not "Notice of Error" was not the correct mechanism for challenging a denial (Dkt. No. 9-1, Am. Compl., Ex. E, June 28, 2017 letter).
[54] *Wiggins I,* 2015 WL 4638452, at *8.

However, as was noted above, Plaintiff here is expressly *not* challenging the loss mitigation denial, thus making *Wiggins I* distinguishable.  Further, *Wiggins I* did not involve a borrower's claimed Regulation X violation based on a mistake or error by the lender relating to the factual information provided to the lender and on which the loss mitigation denial was apparently based.  Also, on remand, the *Wiggins III* court held that the borrower stated a plausible claim under Regulation X by alleging that the lender failed to provide the specific information required by 12 C.F.R. § 1024.41(d) regarding the reasons for its denial.  There, the lender generally stated only that the reasons for denial arose from "limitations in the servicing agreement" and "failure to meet investor guidelines."[55]  Based on these vague descriptions, *Wiggins III* allowed that portion of the Amended Complaint to proceed.[56]

Finally, to the extent (if any) that *Wiggins I* and *III* can be read to mean that the exchange of information relating to a loss mitigation application does not constitute servicing of a mortgage loan (as Wells Fargo appears to argue), this Court disagrees with Wells Fargo for the reasons stated above.   In particular, 12 C.F.R. § 1024.41 describes "Loss Mitigation Procedures" and the rights and duties of the parties in that process.  The principal (if not the only) parties described in that section (and in most of the other provisions of Regulation X, including §§ 1024.35 and 1024.36) are the "borrower" and the "servicer."  In this Court's view, duties (and rights) expressly ascribed to a "servicer" in the loss mitigation process must constitute the servicing of a mortgage loan. Thus, the Court finds that an asserted error relating to the information underlying a loss mitigation application falls within 12 C.F.R. § 1024.35(b) as an "error relating to the servicing of a borrower's mortgage loan."  12 C.F.R. § 1024.35(b)(11).  This, in turn, requires the "servicer" (Wells Fargo) to respond as provided in 12 C.F.R. § 1024.35(e).  The Court further finds that the "servicing"

---

[55] *Wiggins III*, 2016 WL 7115864, at *7.
[56] *Wiggins III*, 2016 WL 7115864, at *5.

functions of the Bank in this case include the Bank's duties and obligations in processing and exchanging information relating to a loss mitigation application, as defined and described in §§ 1024.35, 1024.36, and 1024.41.[57]

### D.     The Request for Information

The Debtor also couched her April 5, 2018 letter to the Bank as a Request for Information under 12 C.F.R. § 1024.36 (as well as a Notice of Error under 12 C.F.R. § 1024.35), in another effort to elicit a more substantive response from the Bank as to the factual basis for the denial of her loan modification, particularly as related to the income determination.[58]  The immediate precursor to the Debtor's April 5, 2018 letter was the Bank's March 19, 2018 denial letter, which offered a short sale; flatly stated that the Bank had calculated Debtor's income at $5,503 per month without further detail on its calculation; and noted that Debtor was ineligible for loan modification. That same letter also identified the Bank as servicer and invited Debtor to appeal or to "notify us of an error."[59]  The Debtor's April 5, 2018 letter included a succinct, one-paragraph counter-calculation of her monthly income (apparently with paystubs as exhibits).[60]  The Bank responded with a May 3, 2018 letter from counsel, who acknowledged the Debtor's letter as a "purported" QWR (Qualified Written Request) and declared that it was not the proper mechanism "to challenge the accuracy of a loss mitigation denial decision."[61]

Here again, there is no dispute that Wells Fargo did not provide the Debtor with a substantive response to the Request for Information (or the Notice of Error), other than to advise of the Bank's position that the QWR was not the way to challenge a loss mitigation denial.

---

[57] *See also Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 806-07 (E.D. Pa. 2014) discussed *infra*.
[58] Dkt. No. 9-1, Am. Compl., Ex. G, Apr. 5, 2018 letter.
[59] Dkt. No. 9-1, Am. Compl., Ex. F, Mar. 19, 2018 letter.
[60] Dkt. No. 9-1, Am. Compl., Ex. G, Apr. 5, 2018 letter.
[61] Dkt. No. 9-1, Am. Compl., Ex. H, May 3, 2018 letter.

However, as previously noted, the Debtor's position is that she is not challenging the denial, but rather how the Bank arrived at its income number and the information on which that determination was based.  So the real issue here is whether Wells Fargo is required to provide a substantive response to the Request for Information in these circumstances.  The Court begins its analysis with 12 C.F.R. § 1024.36 ("Requests for Information"), which states in primary part:

> (a) Information request. A servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan. . . . A qualified written request that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section, *and a servicer must comply with all requirements applicable to a request for information with respect to such qualified written request.*

12 C.F.R. § 1024.36 (emphasis supplied).

This Regulation requires the servicer to acknowledge the request within five business days and to make a substantive response within thirty business days.  12 C.F.R. § 1024.36(c) and (d)(2)(i)(B).  The parameters of the servicer's response are simple:  the servicer must (i) provide the information; or (ii) notify the borrower, after a "reasonable search" that it does not have the information (with an explanation for *that* determination), and provide the borrower with contact information for the likely source of the information:

> (d)  Response to information request—

> (1) Investigation and response requirements. Except as provided in paragraphs (e) and (f) of this section, a servicer must respond to an information request by either:

> > (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or
> > (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

23

12 C.F.R. § 1024.36(d)(1)(i) and (ii).

The servicer is not required to respond if it deems the borrower's request "[d]uplicative"; a demand for "[c]onfidential, proprietary or privileged information"; "[i]rrelevant"; "[o]verbroad or unduly burdensome"; or "[u]ntimely" (requested more than a year (i) after the servicing function was transferred from this servicer; or (ii) after the loan was discharged).  12 C.F.R. § 1024.36(f)(1). If the servicer deems that one of these exceptions applies, the servicer must so notify the borrower within five business days after making that determination and provide the reasons therefor.  12 C.F.R. § 1024.36(f)(2).

In this case, nonavailability under § 1024.36(d)(ii) is not a plausible response, nor did Wells Fargo assert that position in its correspondence with the Debtor's counsel or in its briefing to this Court.  Similarly, Wells Fargo did not notify the Debtor that any of the exceptions set forth in § 1024.36(f)(2) apply.   Thus, §1024.36(a) applies and requires Wells Fargo to provide the requested information.

The Debtor simply asked for an explanation of how Wells Fargo determined or calculated the Debtor's income and the information on which that determination was based.  The Bank does not indicate in any of its responsive letters that an entity other than itself was responsible for that calculation or that it is otherwise unavailable.[62]  Moreover, Debtor's generally clear and succinct counter-calculation in her April 5, 2018 letter meets none of the exceptions that would excuse the servicer's response:

> Please review the enclosed application and paystubs for our Client and her non-borrower contributor spouse.  Our Client's paystubs clearly show gross income of $2,993.05 per individual bi-monthly [sic, bi-weekly] pay period for our Client alone, or a monthly gross income of approximately $6,484.94.  Her husband's documented contribution to the household is approximately an additional $5,373.33.  Their combined documented income is approximately $11,858.27.

[62] Dkt. No. 9-1, Am. Compl., Exs. A, C, E, F and H.

24

> Your calculation ignores more than fifty percent of our Client's documented income without providing any justification for the discount.[63]

As was previously noted, no substantive response or information was provided to this Request.  Thus, Wells Fargo's failure to respond to this Request for Information is a plausible Regulation X violation.  *See, e.g., Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 806-07 (E.D. Pa. 2014).  *Wilson* involved a servicer's motion to dismiss a complaint that included two counts for RESPA violations, namely: (i) failure to conduct a reasonable investigation in response to a Notice of Error; and (ii) failure to respond to Requests for Information.

In *Wilson*, the borrower received contradictory explanations about why her loan could not be modified followed by contradictory responses to her Requests for Information and Notice of Error.  *Wilson*, 48 F. Supp. 3d at 805.  The court first found plausible plaintiff's claim that the servicer had not made a "reasonable investigation" in response to her Notice of Error.  *Wilson*, 48 F. Supp. 3d at 805.  In *Wilson*, the borrower also requested, in its Request for Information, copies of servicing logs, audio files, property inspection reports, invoices from the foreclosure firm and documents which the borrower submitted to the servicer (a demand much more extensive than Debtor's in the instant case).  *Wilson*, 48 F. Supp. 3d at 806.  The servicer refused to provide most of the documents and, in its motion to dismiss, invoked the 12 C.F.R. § 1024.36(f)(i)-(iv) exceptions, apparently in blanket fashion.  *Wilson*, 48 F. Supp. 3d at 794, 806.

The *Wilson* court found that this blanket denial did not meet the 12 C.F.R. § 1024.36(f)(1) obligation that the servicer "reasonably determine[ ]" that one or more of these exceptions were applicable.[64]  *Id.* at 806.  The court accordingly denied the servicer's request to dismiss both

---

[63] Dkt. No. 9-1, Am. Compl., Ex. G, Apr. 5, 2018 letter. The Court notes that a *bi-weekly* income of $2,993.05 would result in a monthly gross income of $6,484.94 ($2,993.05 *x* 26 ÷ 12 = $6,484.94).

[64] The District Court determined:

> Regulation X, however, changes the requirement imposed on the servicer from conducting just an

RESPA counts of the plaintiff-borrower's complaint. *See also Alfaro v. Wells Fargo, N.A.*, 2017 WL 4969334, at *5 (D.N.J. Nov. 1, 2017) (Bank's lack of a sufficient response as to plaintiff's claim that the Bank gave inconsistent or contradictory reasons for loss mitigation denial in response to a Notice of Error set forth a plausible RESPA violation claim). In this case, the Bank's failure to respond to Debtor's Request for Information as to the income determination also states a plausible claim for violation of 12 C.F.R. § 1024.36(d).

Similarly, in the analogous circumstance of an alleged RESPA violation, and in the unreported decision of *Herrara v. Central Loan Administration & Reporting*, 2017 WL 4548268, at *3 (D.N.J. Oct. 12, 2017), Chief Judge Linares held that the plaintiffs/borrowers stated a plausible claim for a RESPA claim where the borrower alleged that the lender failed to adequately respond to Requests for Information and Notices of Error relating to the facts underlying the denial of their loss mitigation application. *Id*. at *1. The plaintiffs/borrowers alleged that the lender first sent incomplete or contradictory documents to plaintiffs and that the lender did not respond to the borrowers' requests for their servicing files. *Id.* at *1. In denying the defendant/lender's motion to dismiss, the court first found that at least one of the plaintiffs' letters requesting information constituted a QWR. The court then rejected as insufficient defendant's argument that it had previously provided plaintiffs with "most" of the requested information. *Id*. at *3. In this regard, the court noted that at least five of the plaintiffs' requests, including the request for their entire loss mitigation files, were not met. *Id*. at *3. Thus, plaintiffs alleged enough facts to survive a motion

---

"investigation" for the information to conducting a "a reasonable search for the requested information." 12 C.F.R. § 1024.36(d)(1)(ii). Further, this regulation makes clear that a servicer's duty to comply with its response obligations are obviated only "if the servicer ***reasonably*** determines that" the documents meet any of the enumerated exceptions. 12 C.F.R. § 1024.36(f)(1) (emphasis added).

*Wilson*, 48 F. Supp. 3d at 806 (emphasis in original). As noted above, Wells Fargo has not agreed that any of the exceptions are applicable.

to dismiss.

Here, there is no serious dispute that at least Plaintiff's April 5, 2018 letter constituted a QWR, even though it was acknowledged by Wells Fargo as only a "purported" QWR.  As was determined by the *Herrera* court, a QWR is "written correspondence . . . that includes a statement of reasons for the belief of the borrower, . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  *Id.* at *2.  Like the letters in *Herrara*, the detailed letters here, including particularly the April 5, 2018 letter, make clear the information that the borrower was looking for, i.e., how the income of the borrower and her spouse was calculated (among the other items listed).  Like *Herrara,* the borrower here has set forth a plausible RESPA claim for failure to adequately respond to their Request(s) for Information.[65]

### E.    Loss Mitigation Procedures

12 C.F.R. § 1024.41 ("Loss mitigation procedures") states at the outset at 12 C.F.R. § 1024.41(a) ("Enforcement and limitations"):

> (i)    that "a borrower may enforce the provisions of this section pursuant to [12 U.S.C. § 2605(f), the RESPA individual rights of action and remedies section]"; and

> (ii)    that "[n]othing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law."

12 C.F.R. § 1024.41(a).  Section 1024.41 explicitly describes the duties of a servicer in connection with the loss mitigation or loan modification process, including the disclosure of the "specific reason or reasons" for denial:

12 C.F.R. § 1024.41(d) ("Denial of loan modification options") states in full:

---

[65] The Court also notes that Wells Fargo does not even refer to 12 C.F.R. § 1024.36, which is the regulation regarding Requests for Information, in its thirty-two-page brief.

> (d) Denial of loan modification options. If a borrower's complete loss
> mitigation application is denied for any trial or permanent loan modification
> option available to the borrower pursuant to paragraph (c) of this section, a
> *servicer* shall state in the notice sent to the borrower pursuant to paragraph
> (c)(1)(ii) of this section *the specific reason or reasons for the servicer's
> determination for each such trial or permanent loan modification option
> and, if applicable, that the borrower was not evaluated on other criteria.*

12 C.F.R. § 1024.41(d) (emphasis supplied).  Thus, on the face of 12 U.S.C. § 2605(f) (and 12

C.F.R. § 1024.41 generally), the statute and related regulation contemplate the participation of the

servicer in the loss mitigation/loan modification process.

In this Court's view, the procedures of § 1024.41, as complemented by 12 C.F.R.

§§ 1024.35 and 1024.36, expressly describe and define the duties of a servicer in the loan

modification/loss mitigation process, including how errors can be identified and addressed, how

requests for information can be made, and what the duties of the servicer (and borrower) are in

these circumstances.  These provisions must be read as an integrated whole, rather than as discrete

and essentially unrelated pieces, as Wells Fargo seems to argue.

For these reasons, the Court rejects the Bank's arguments to the effect that the definition

of "servicer" or "servicing" does not include these specific duties.  To the contrary, they are

included explicitly in these sections.  Indeed, to adopt the Bank's argument, the Court would have

to ignore essentially all of the provisions of these sections that describe in detail what the servicer

needs to do in responding to Notices of Error, Requests for Information and Loss Mitigation

applications.  Instead, the Court concludes that these sections further describe and define the duties

of a servicer in these circumstances.  Thus, for the reasons set forth above, this Court finds that the

Debtor set forth a plausible claim for the Bank's violation of 12 C.F.R. § 1024.41(d) by failing to

set forth the *specific* reasons for its denial of the Debtor's application (other than by referring to

an income number that is nowhere found in the Debtor's submissions).

## F. **Appeal Process and Interpretative Comments**

12 C.F.R. § 1024.41(h) sets forth the appeal process after denial of loss mitigation:

(h) Appeal process.

> (1) Appeal process required for loan modification denials. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower.

> (2) Deadlines. A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.

> (3) Independent evaluation. An appeal shall be reviewed by *different personnel* than those responsible for evaluating the borrower's complete loss mitigation application.

> (4) Appeal determination. Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based upon the appeal and, if applicable, how long the borrower has to accept or reject such an offer or a prior offer of a loss mitigation option. A servicer may require that a borrower accept or reject an offer of a loss mitigation option after an appeal no earlier than 14 days after the servicer provides the notice to a borrower. A servicer's determination under this paragraph is not subject to any further appeal.

12 C.F.R. § 1024.41(h) (emphasis supplied).

The Bank in addressing this section invoked "Supplement I to Part 1024—Official [Consumer Financial Protection] Bureau Interpretations" that provide the Bureau's guidance on 12 C.F.R. § 1024.41 (among other sections of Regulation X). These interpretations include in relevant part:

**41(c)(1) Complete loss mitigation application.**

> 1. Definition of "evaluation." *The conduct of a servicer's evaluation with respect to any loss mitigation option is in the sole discretion of a servicer.* A servicer meets the requirements of § 1024.41(c)(1)(i) if the servicer makes a determination regarding the borrower's eligibility for a loss mitigation program.

Consistent with § 1024.41(a), because nothing in section 1024.41 should be construed to permit a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or provision of, any loss mitigation option, § 1024.41(c)(1) does not require that an evaluation meet any standard other than the discretion of the servicer.

**41(d) Denial of loan modification options.**

1. Investor requirements. *If a trial or permanent loan modification option is denied because of a requirement of an owner or assignee of a mortgage loan, the specific reasons in the notice provided to the borrower must identify the owner or assignee of the mortgage loan and the requirement that is the basis of the denial.* A statement that the denial of a loan modification option is based on an investor requirement, without additional information specifically identifying the relevant investor or guarantor and the specific applicable requirement, is insufficient. However, where an owner or assignee has established an evaluation criteria that sets an order ranking for evaluation of loan modification options (commonly known as a waterfall) and a borrower has qualified for a particular loan modification option in the ranking established by the owner or assignee, it is sufficient for the servicer to inform the borrower, with respect to other loan modification options ranked below any such option offered to a borrower, that the investor's requirements include the use of such a ranking and that an offer of a loan modification option necessarily results in a denial for any other loan modification options below the option for which the borrower is eligible in the ranking.

2. Net present value calculation. If a trial or permanent loan modification is denied because of a net present value calculation, the specific reasons in the notice provided to the borrower must include the inputs used in the net present value calculation.

3. Determination not to offer a loan modification option constitutes a denial. A servicer's determination not to offer a borrower a loan modification available to the borrower constitutes a denial of the borrower for that loan modification option, notwithstanding whether a servicer offers a borrower a different loan modification option or other loss mitigation option.

4. Reasons listed. *A servicer is required to disclose the actual reason or reasons for the denial.* If a servicer's systems establish a hierarchy of eligibility criteria and reach the first criterion that causes a denial but do not evaluate the borrower based on additional criteria, a servicer complies with the rule by providing only the reason or reasons with respect to which the borrower was actually evaluated and rejected as well as notification that the borrower was not evaluated on other criteria. A servicer is not required to determine or disclose whether a borrower

30

would have been denied on the basis of additional criteria if such criteria were
not actually considered.

Supplement I to Part 1024—Official Bureau Interpretations (emphases supplied).

In this Court's view, these comments and the regulations themselves do not expressly or implicitly mean that a borrower cannot seek to correct or clarify the information on which the servicer's decision is based, as the Bank appears to argue. To the contrary, both the express language of the regulations and the comments make clear that the servicer is required to disclose the *specific* reasons for the denial (among other obligations). This, of course, makes sense because that would assist the borrower in determining whether to appeal and what the appeal should address.

In this case, to better understand the bases for the Bank's denial and to attempt to address the reasons for denial on appeal, the Debtor understandably sought the information on which the Bank's conclusory statements about the Debtor's income were based. Since the Bank used income numbers that were significantly different and lower than the Debtor provided, the Debtor sought an explanation of how the Bank arrived at its numbers. That is not a challenge to the Bank's decision to deny her application. Instead, the Debtor was simply trying to understand how the Bank got to the numbers that led to the denial. This is at least one step toward, but prior to, the evaluation process, not the evaluation itself. To use a somewhat extreme example, if a borrower provided a W-2 that stated she made $200,000 in the prior year and the Bank denied her application because her income was $20,000, the borrower would and should be entitled to try to correct that information ($200,000 vs. $20,000) so as to ensure that the Bank's determination is made on the proper factual grounds. Certainly, the borrower is entitled to an explanation as to how the Bank arrived at its substantially different income number and the underlying information on which that determination was based.

In sum, in this Court's view, (i) attempting to correct an income number utilized by the Bank in making its determination that the borrower believes is incorrect on its face and (ii) seeking to understand how the Bank reached its different income numbers, are precisely the types of errors or deficiencies that the regulations seek to address by Notices of Error and Requests for Information and by requiring specific reasons for any denial.[66]  For the reasons stated, the Bank's failure to respond beyond providing a different income number that is otherwise unsupported and its similar failure to provide the underlying information state plausible claims under §§ 1024.35, 1024.36 and 1024.41 of Regulation X.  The same is true of the Debtor's claim that the Bank's same personnel were utilized in making the initial denial decision and determining the appeal, as the denial and appeal letters were signed by the same person with respect to the first application. The same person (though different than the first application) also signed both the denial and appeal letters relating to the Debtor's second loss mitigation application.  Thus, it *could* be, or, in other words, it is plausible that the same personnel were utilized on the initial denial and on appeal.  Of course, plausibility does not mean the Debtor proved her claims.  Instead, they are sufficient to survive a motion to dismiss at this stage of the proceedings.

### G. Applicability of N.J.S.A. § 10:5-12(i)(4), the New Jersey Law Against Discrimination

Debtor argues that the Bank's failure to consider her husband's commission income in calculating her creditworthiness violates § 10:5-12(i)(4), the New Jersey Law Against Discrimination ("NJLAD"), which states in relevant part:

N.J.S.A. § 10:5-12.  Unlawful employment practice or unlawful discrimination.

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

---

[66] See § 1024.41(d).

      i.      For any person, bank, banking organization, mortgage company, insurance company or other financial institution, lender or credit institution involved in the making or purchasing of any loan or extension of credit, for whatever purpose, whether secured by residential real estate or not, including but not limited to financial assistance for the purchase, acquisition, construction, rehabilitation, repair or maintenance of any real property or part or portion thereof or any agent or employee thereof: . . .

      (4) To discriminate against any person or group of persons because of the source of any lawful income received by the person or the source of any lawful rent payment to be paid for the real property; . . . .

N.J.S.A. § 10:5-12(i)(4). The remedies for violation of NJLAD are set forth at N.J.S.A. § 10:5-13 and include "[a]ll remedies available in common law tort actions . . . in addition to any provided by this act or any other statute." The complainant may initiate the action through the Division on Civil Rights or through the Superior Court of New Jersey. N.J.S.A. § 10:5-13.

The Debtor argues that the Bank's denial is based on the source of the income of the Debtor's spouse (i.e., commissions) and, therefore, violates NJLAD. The Bank argues that the NJLAD does not apply for three reasons. First, the alleged discrimination is as to the nondebtor spouse's income, so the statute does not apply on its face. Second, that a loss mitigation application is not "the making or purchasing of any loan or extension of credit," so the statute does not apply on this ground as well. And third, the Bank argues that commission income does not fall within the scope of NJLAD.

The Court will address these arguments in turn. First, the Debtor urges the Court to apply the plain meaning rule in interpreting this section of NJLAD. The Court will do so and agrees with the Bank that the plain language of the statute requires the discrimination to relate to income attributable to the aggrieved person, i.e., "because of the source of lawful income received by the person." N.J.S.A. 10:5-12(i)(4) (the "Source of Income Provision"). Here, the income that is the

subject of the Amended Complaint "is derived from her husband's sales commissions,"[67] rather than the Debtor. Additionally, the Debtor is the plaintiff, and Debtor's husband is not a party to this action. Thus, the NJLAD claim fails as the provision relied upon by Debtor is not applicable to the income of her nonparty spouse on its face.[68]

The Court also agrees with the Bank that commission income does not fall within the Source of Income Provision of NJLAD, but for reasons different than those asserted by the Bank. By prohibiting discrimination based on the source of income, NJLAD makes clear that so long as the source of income was lawful, there could be no discrimination on that basis. However, the Debtor's argument conflates the meaning of "source" of income with the *evaluation* of that income in making a credit decision. The Bank has a necessary and, in this Court's view, undeniable right to *evaluate* the quality or consistency of the Debtor's (or any borrower's) income, irrespective of its source. Not even the Debtor will argue (and counsel essentially conceded as much at oral argument) that the Bank may not evaluate obviously contingent income like a commission -- that is subject to all sorts of variables -- differently than, for example, income based on a straight salary.

In sum, if a Bank chooses to discount – or even reduce to zero -- commission income, that is not discrimination but the exercise of necessary discretion in evaluating whether to extend credit or offer a loan modification. To take away this necessary discretion based on NJLAD would sweep too broadly. That type of broad interpretation would unnecessarily and inappropriately restrict a

---

[67] See Dkt. No. 9-1, Am. Compl., ¶ 33.

[68] The Court also rejects the Debtor's argument that because the court in *Franklin Tower One, L.L.C.*, 304 N.J. Super. 586, 591 (App. Div. 1997), *aff'd*, 157 N.J. 602 (1999) held that the statute (a precursor to N.J.S.A. § 10:5-12(g), which prohibits income discrimination in real property rentals) was intended to protect spouses "dependent on alimony and child support payments," its protection should also extend to *any* income of the aggrieved person's spouse. First, the holding is simply not that broad, i.e., it did not extend to *any* income from a spouse. Further, alimony and support are paid to the allegedly aggrieved person. Here, the commission income is paid to the Debtor's spouse, not the Debtor. Second, the categories of income referred to in the *Franklin Tower One* case – welfare, alimony and child support, tenant assistance – are consistent with the statute's stated purpose at the time: to prevent housing discrimination against tenants with lawful income. *Id.* at 591. Thus, the *Franklin Tower One* case cannot be relied upon for the exceedingly broad interpretation urged by the Debtor.

34

lender's ability to evaluate the quality or consistency of different types of income. Finally, reading

NJLAD as broadly as the Debtor suggests would indirectly allow the Debtor to do what RESPA

and Regulation X say you cannot do – claim a violation of those laws and regulations based on a

lender's discretionary determination *not* to grant a loan modification.[69] Thus, Debtor's NJLAD

claim fails on this separate and independent ground as well.[70]

### H.  Application of N.J.S.A. § 56:8-2, the New Jersey Consumer Fraud Act

Debtor argues that the Bank's alleged violation of NJLAD for failing to consider her

spouse's income from sales commissions in determining her creditworthiness also violates

N.J.S.A. § 56:8-2, the New Jersey Consumer Fraud Act ("NJCFA") as an "unconscionable

business practice." N.J.S.A. § 56:8-2. The NJCFA states in relevant part:

> The act, use or employment by any person of any *unconscionable commercial
> practice*, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression or omission, in connection
> with the sale or advertisement of any merchandise or real estate, or with the
> subsequent performance of such person as aforesaid, whether or not any person has
> in fact been misled, deceived or damaged thereby, is declared to be an unlawful
> practice [with exceptions not relevant here].

N.J.S.A. § 56:8-2 (emphasis supplied). In this regard, the Debtor notes that the New Jersey

Supreme Court in *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 580-81 (2011) determined that

---

[69] *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988) (under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, federal
government can create laws that preempt state laws "to the extent it is believed that such action is necessary to achieve
its purpose"); *Crozier v. Johnson & Johnson Consumer Cos., Inc.* 901 F. Supp. 2d 494, 503 (D.N.J. 2012) (federal
preemption "will not lie unless it is the clear and manifest purpose of Congress") (internal citations omitted). The
intent of Congress to displace state law may be evidenced by (i) a regulatory scheme "so pervasive as to make
reasonable the inference that Congress left no room for the States to supplement it"; (ii) the existence of a field "in
which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws
on the same subject"; (iii) a situation in which "the state policy may produce a result inconsistent with the objective
of the federal statute"; or (iv) a circumstance in which it is impossible to comply with both the federal and the state
statute) (internal citations omitted). *Id.* at 746-47. Virtually all of these factors are plainly present here, including
particularly the pervasive regulatory scheme and the possibility of inconsistent results.
[70] Because the Court has held that NJLAD is not applicable on these separate grounds, it need not reach the issue of
whether a loss mitigation application involves an "extension of credit." This issue is a much closer call, with cases
cited by each side supporting either argument. Thus, that determination is left for another day.

post-judgment mortgage forbearance agreements could be subject to the Consumer Fraud Act as a

"fraud 'in connection with' 'subsequent performance' of a loan."

While the *Gonzalez* case makes clear that post-judgment forbearance agreements may fall

within the NJCFA, that is certainly not the end of the inquiry.  As is noted by the Bank, the Debtor's

NJCFA claim is based entirely on the Bank's alleged violation of the NJLAD as an unconscionable

practice.[71]  No other claim of fraud, deception or the like is made.  Since the Court has already

held that the Debtor's NJLAD claim fails, the NJCFA claim necessarily fails as well as the Debtor

has not alleged any "unconscionable commercial practice."  Accordingly, the Court will deny the

Debtor's motion to amend as to Counts II and III, but without prejudice to the Debtor's right to

subsequently seek leave to amend under the standards set forth in Bankruptcy Rule 7015, which

is discussed in the following section.

## I.    Standard for Amending Complaint under FED. R. BANKR. P. 7015/FED. R. CIV. P. 15

FED. R. BANKR. P. 7015 fully incorporates FED. R. CIV. P. 15 (Amended and Supplemental

Pleadings) which states at Rule 15(a)(2) that a party may amend pleadings (after specific deadlines

have passed) "only with the opposing party's written consent or the court's leave."  The Rule

provides that:  "The court should freely give leave when justice so requires."  FED. R. CIV. P.

15(a)(2).  The Supreme Court identifies the following factors to consider:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper
> subject of relief, he ought to be afforded an opportunity to test his claim on the
> merits. In the absence of any apparent or declared reason -- such as undue delay,
> bad faith or dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice to the opposing
> party by virtue of allowance of the amendment, futility of amendment, etc. -- the
> leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962); see also *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir.

---

[71] See Dkt. No. 9-1, Am. Compl. at ¶¶ 76-86.

2004) ("[w]e have held that motions to amend pleadings [under Rule 15(a)] should be liberally

granted"); *Grayson v. Mayview State Hosp*., 293 F.3d 103, 108 (3d Cir. 2002) ("[u]nder Rule 15(a),

if a plaintiff requests leave to amend a complaint . . . such leave must be granted in the absence of

undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment"); *In re*

*Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir. 1997); *Lorenz v. CSX Corp.,* 1

F.3d 1406, 1413-14 (3d Cir. 1993).

"Futility" -- on which the Bank's entire objection is based -- means that "the proposed

amendment still cannot state a claim on which relief can be granted or withstand a further motion

to dismiss under Fed. R. Civ. P. 12(b)(6)." *In re Albanes*, 560 B.R. 155, 164-65 (Bankr. D.N.J.

2016), *aff'd* 2017 WL 3037384 (July 18, 2017), citing *In re Burlington*, 114 F.3d at 1434:

> "Futility" is therefore assessed under Rule 12(b)(6) standard. *In re*
> *Burlington,* 114 F.3d at 1434. *See also In re NAHC, Inc., Sec. Litig.,* 306
> F.3d 1314, 1332-33 (3d Cir. 2002) (leave to amend a securities fraud
> complaint denied as one claim was time-barred and plaintiffs had not
> demonstrated their ability to develop facts to support another claim).

*In re Albanes*, 560 B.R. at 165.

To decide a motion under FED. R. CIV. P. 12(b)(6), which is incorporated into FED. R.

BANKR. P. 7012, the Court accepts all well-pleaded allegations in the complaint as true, views

them in the light most favorable to the plaintiff, and determines whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. Cnty. of Allegheny*, 515

F.3d 224, 231 (3d Cir. 2008). To survive dismissal, a complaint must contain sufficient factual

matter which, if accepted as true, "state[s] a claim for relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d

Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  The pleadings must raise the possibility, though not the probability, of the conduct complained of and show "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

Under these standards, the Court undertakes a two-part analysis which requires it: (i) to identify and reject labels, conclusory allegations, and formulaic recitation of the elements of a cause of action; and then (ii) to "draw on its judicial experience and common sense" to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief.  *Iqbal*, 556 U.S. at 678-79.  The Court "generally consider[s] only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" along with authenticated documents which form the basis of the claim.  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied*, 510 U.S. 1142 (1994).  A court may also "take judicial notice of a prior judicial opinion."  *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009); s*ee Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

In the instant case, for the reasons stated above, the Debtor's First Amended Complaint states a claim that is plausible on its face—that the Bank did not state with sufficient specificity the grounds for denial, consistent with 12 C.F.R. § 1024.41(d) and Supplement I to Part 1024, particularly § 41(d)(1) and (2), particularly when the Debtor asked the Bank:

    (i)     by May 29, 2017 letter to explain why the Bank used a figure of $5,860 rather than $8,968 as monthly income;[72] and

    (ii)    by April 5, 2018 letter to explain why the Bank used a figure of $5,503 rather than $11,858.27 as monthly income.[73]

---

[72] Dkt. No. 9-1, Am. Compl., Ex. B, Debtor's May 29, 2017 letter.

[73] Dkt. No. 9-1, Am. Compl., Ex. G, Debtor's April 5, 2018 letter.  The Debtor characterized this April 5, 2018 letter as a Qualified Written Request ("QWR") rather than as a Notice of Error ("NOE"), apparently to try to circumvent

These requests are not (in this Court's view) "overbroad" Notices of Error that would relieve the Bank of the duty to respond.[74]  The Bank also failed to respond to the Debtor's Notices of Error and provide the Debtor with any of the information she requested regarding the income determination, in potential violation of 12 C.F.R. §§ 1024.35 and 1024.36.

Additionally, on the face of the Bank's letters, the Bank *appears* to have used the same person to (i) deny loan modification; and (ii) deny the appeal on both the first and second applications, in derogation of 12 C.F.R. § 1024.41(h)(3) ("An appeal shall be reviewed by *different personnel* than those responsible for evaluating the borrower's complete loss mitigation application") (emphasis supplied):

(i)     The May 22, 2017 letter denying loan modification and June 7, 2017 letter denying appeal were both signed by Amanda Solmsa, Home Preservation Specialist;[75]

(ii)    The March 19, 2018 letter denying loan modification and May 1, 2018 letter denying appeal were both signed by Hiliary Phillips, Home Preservation Specialist.[76]

At this early stage of the proceedings, the Bank's observation that a supervisor may review an employee's initial evaluation pursuant to 12 C.F.R. Part 2014, Supp. I, ¶ 41(h)(3)-1 is not sufficient to rebut the Debtor's plausible claim when the names are identical on both sets of letters.

Finally, to the extent that Mr. Reichner's letter of June 28, 2017 states that it is a response to Debtor's May 29, 2017 Notice of Error, Mr. Reichner's letter does not appear to conform to the requirements of 12 C.F.R. § 1024.35(e)(1)(i)(B), particularly because it did not notify the Debtor

---

the Bank's response in Spring 2017 that an appeal (not an NOE) was not a proper response to a denial of loan modification. The Bank (through Mr. Reichner) did not respond substantively to either of Debtor's letters.

[74] 12 C.F.R. § 1024.35(g)(1)(ii) relieves the servicer of the duty to respond to a Notice of Error, if, among other events, the Notice of Error is "overbroad."  That regulation provides: "A notice of error is overbroad if the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account."

[75] Dkt. No. 9-1, Am. Compl., Ex. A, May 22, 2017 letter from Bank; Ex. C, June 7, 2017 letter from Bank.

[76] Dkt. No. 9-1, Am. Compl., Ex. F, March 19, 2018 letter from Bank; Dkt. No. 11-1, Reichner Certif., Ex. 1, May 1, 2018 letter from Bank.

that she had the right to request the documents upon which the Bank relied in denying her loan modification.[77]

For all the forgoing reasons, the Court finds that the Debtor has stated a plausible claim for Regulation X violations under Count I of the Amended Complaint, but has not stated plausible claims for relief under Counts II and III based on the current state of the record.   However, the denial of the Debtor's Motion as to these Counts is without prejudice to her right to seek leave to amend her claims under FED. R. CIV. P. 15 and Bankruptcy Rule 7015.  *See, e.g., Wiggins II*, 2016 WL 5952739 at *4 (urging the trial court to dismiss a complaint with prejudice only if the court also "make[s] a finding that any amendment would be inequitable or futile" and directing that the trial court should "approach" futility "with caution").  At this early stage, the Court simply cannot say that any proposed amendment would necessarily be "inequitable" or "futile."

\*   \*   \*

In concluding, the Court is compelled to note that an answer by the Bank to the relatively simple and straightforward questions as to: (i) whether and why the Debtor's husband's income was discounted or disregarded; and (ii) how the Bank determined her income as reported in the denial letters, may have avoided this extensive motion practice (and perhaps the entire case) and certainly would have made for a much easier and understandable process, legally and practically. Frankly, the Court does not understand why the Bank did not provide this basic information, based

---

[77] Dkt. No. 9-1, Am. Compl., Ex. E, June 28, 2017 letter from Reichner.  12 C.F.R. § 1024.35(e)(1)(i)(B) requires the Bank, in responding to a Notice of Error, to

> provid[e] the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i)(B).

on the applicable law or as a simple matter of substantively responding to inquiries that the Bank,

as servicer, invited in its correspondence to the Debtor.

## VI.      <u>**CONCLUSION**</u>

For all the foregoing reasons, the Debtor's Motion to file the Amended Complaint is

granted as to Count I and denied without prejudice as to Counts II and III.  An Order consistent

with this Opinion is being separately entered by the Court.


Dated: November 1, 2018                     /s/Vincent F. Papalia
                                            VINCENT F. PAPALIA
                                            Judge, United States Bankruptcy Court